IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LACI DROLL, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF KEOTA, IOWA; TONY CANSLER, in his official capacity as Mayor; and DOUG CONRAD, in his official capacity as Police Chief,<br><br>Defendants. | Case No. 4:20-cv-88 |

# FIRST AMENDED COMPLAINT

Plaintiff Laci Droll ("Plaintiff" or "Laci"), for her First Amended Complaint against the Defendants, states and alleges as follows:

## INTRODUCTION

1. This is a civil rights action for declaratory and injunctive relief arising under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201, and the laws of the State of Iowa. This action stems from Defendants' violations of Plaintiff's rights under the United States Constitution arising from Defendants' enforcement of a ban on certain breeds of dogs in Keota, Iowa.

2. The City of Keota, Iowa (the "City") adopted a Pit Bull Ban, codified at Keota Municipal Code Title § 4-1-8 and titled "Dangerous Animals." After the filing of Plaintiff's Complaint, on March 26, 2020, the City repealed its prior Pit Bull Ban and replaced it with a new ordinance also codified at Keota Municipal Code Title § 4-1-8 (the "Amended Ordinance") which prohibits keeping or harboring any dog that is an "American Pit Bull Terrier . . . American Staffordshire Terrier . . . Staffordshire Bull Terrier . . .[o]r any dog displaying a majority of the distinguishable physical characteristics as set forth and established as physical characteristics by

1

the American Kennel Club [or] United Kennel Club for any of the aforementioned breeds." KEOTA, IOWA, CODE TITLE § 4-1-8(3)(i-iv) (as amended March 26, 2020).

3. Upon information and belief, the City adopted the Amended Ordinance in an effort to remove dangerous dogs from the city limits of Keota and/or reduce the number of dog bites within the city limits of Keota, and will enforce the Amended Ordinance against Plaintiff and her dog once the Amended Ordinance becomes effective.

4. The Amended Ordinance authorizes the City to impound and destroy any dog it deems subject to the Amended Ordinance and provides that any person who violates the Amended Ordinance may be subject to a criminal misdemeanor citation with a fine of up to $500 and up to thirty days imprisonment, or a municipal infraction subject to a fine of up to $750 for a first offense. *See* KEOTA, IOWA, CODE TITLES §§ 1-3-1; 1-3-2(2)(a); 4-1-8(5). Each day that a violation is permitted to exist constitutes a separate offense. KEOTA, IOWA, CODE TITLE § 1-3-2(b).

5. Defendants threatened to enforce the Pit Bull Ban against Plaintiff Laci Droll's dog, Gypsy. On or around January 8, 2020, the City sent Droll a letter demanding that she remove Gypsy from the City by March 9, 2020. On or around March 5, 2020, the Keota City Council published City Council minutes which stated Mayor Tony Cansler would direct Police Chief Doug Conrad to issue municipal infractions to Droll under the Pit Bull Ban beginning on March 10, 2020.

6. As a result of the threatened enforcement of the Pit Bull Ban, Droll was forced to relocate Gypsy to a kennel outside of Keota's city limits on Monday, March 9, 2020, until March 25, 2020, when the City represented that it would no longer enforce the Pit Bull Ban.

7. Plaintiff will again be forced to relocate Gypsy to a kennel outside of Keota's city limits once the Amended Ordinance becomes effective.

8. Removing a dog from its home and the people with whom the dog has bonded and placing the animal in a kennel environment has adverse consequences on the animal, including increased cortisol levels and a clinical condition referred to as separation anxiety. The longer a dog remains in a kennel environment, the more likely it is that some of the physical and emotional changes in the dog may be permanent.

9. The Pit Bull Ban and Amended Ordinance has thereby deprived Plaintiff of the comfort, companionship, and sense of security that her dog provides her and subjected Plaintiff to a reasonable concern that her property may be destroyed and euthanized under the Amended Ordinance. The Pit Bull Ban and Amended Ordinance has further subjected Plaintiff to a reasonable concern that she may be charged with civil or criminal violations.

## JURISDICTION AND VENUE

10. This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution of the United States and other federal statutes.

11. This Court has federal question jurisdiction over this controversy under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper in the Southern District of Iowa under 28 U.S.C. § 1391(b)(1)&(2). The Defendants are residents of the Central Division of this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in the Central Division of this Judicial District.

## PARTIES

13. Plaintiff Laci Droll is an individual who has resided in Keota, Iowa at all relevant times related to the threatened enforcement of the Pit Bull Ban and Amended Ordinance against Droll's dog, Gypsy, as alleged in this Complaint.

14. Defendant City of Keota, Iowa is a municipality for purposes of liability under 42 U.S.C. § 1983 and is located within the geographic area comprising the Southern District of Iowa.

15. Defendant Tony Cansler is the Mayor of Keota, Iowa. Among other official capacity duties, Defendant Cansler is responsible for supervision and direction over Keota's Pit Bull Ban and Amended Ordinance. KEOTA, IOWA, CODE § 2-3-5(1); 4-1-8(5-6). Upon information and belief, Defendant Cansler has exercised his authority to enforce the Pit Bull Ban and will exercise his authority to enforce the Amended Ordinance by, among other things, adopting a policy and practice of enforcing the original and Amended Ordinance and directing City officers under his supervision and control to force Plaintiff Laci Droll to remove her dog Gypsy from the City or be subject to prosecution under the Ordinance.

16. Defendant Doug Conrad is the Police Chief for the City of Keota, Iowa, or is acting as the Police Chief for the City of Keota, Iowa, as Keota's only law enforcement officer. Defendant Conrad is authorized in his official capacity to enforce Keota's Officials ordinances, including the Pit Bull Ban. *See* KEOTA, IOWA, CODE TITLE § 2-3-7(2), (8) & (12); 4-1-8(5-6). Defendant Conrad has exercised his authority to enforce the Pit Bull Ban by, among other things, recommending that the City of Keota proceed with the deadline that was given to Plaintiff Laci Droll in regard to her dog, having a City Officer write citations starting on March 10, 2010, and forcing Plaintiff Laci Droll to relocate Gypsy outside of Keota or face prosecution under the

Ordinance. Upon information and belief, Defendant Conrad will exercise his authority to enforce the Amended Ordinance in a similar manner.

17. Defendants Cansler and Conrad are sued in their official capacities. (Defendants City of Keota, Cansler and Conrad, and those City employees acting under their direction and control, are hereinafter referred to as "Keota Officials").

18. At all relevant times, it has been the pattern, practice and custom of the Keota Officials to enforce the Pit Bull Ban against dogs and dog owners located within the Keota city limits and enforce the Amended Ordinance on and after its effective date.

## FACTUAL ALLEGATIONS

19. Laci Droll adopted two dogs from a shelter. Gypsy, the dog at issue, is a mixed-breed dog of unknown lineage. When adopting Gypsy, Droll assumed her to be a lab mix, but has never been certain of her breed.

20. Gypsy has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

21. Droll was born in Keota and recently returned and purchased a home. Droll attends school and until recently worked at a facility that cares for older adults suffering from dementia. As Droll is pregnant with her second child, she resigned her position in mid-February of 2020 to stay home and care for her children.

22. Droll moved to Keota with two dogs, both from shelters and of unknown genetic origin.

23. After living in Keota for several months, Droll found out the city has a Pit Bull Ban.

24. Droll appeared before the City Council in May of 2019 to object to the Pit Bull Ban.

25. Preston Moore, Iowa State Director at The Humane Society of the United States, attended several meetings with the City Council and helped draft a breed-neutral dangerous dog ordinance.

26. On January 9, 2020, Keota City Councilman Curt Burroughs issued a letter to Droll advising the Council would no longer be modifying the ordinance and ordering her to remove the dogs from Keota within sixty (60) days.

27. The same week Droll received the letter one of her dogs passed away.

28. On or around March 5, 2020, the Keota City Council published City Council minutes which stated Mayor Tony Cansler would direct Police Chief Doug Conrad to issue municipal infractions to Droll under the Pit Bull Ban beginning on March 10, 2020.

29. To save Gypsy from confiscation and impoundment, Droll began temporarily boarding Gypsy at a facility outside of town on March 9, 2020. The cost of boarding Gypsy is $20 per day. Since adopting her, Gypsy has never spent a full day away from Droll's family.

30. On the morning of March 10, 2020, Defendant Doug Conrad came to Droll's home with the evident intention of ticketing Droll under the Pit Bull Ban.

31. When Droll informed Defendant Conrad that Gypsy had been relocated outside of Keota, Conrad told Droll he would continue coming by Droll's house to make sure Gypsy was not present.

32. Being familiar with the discriminatory animus against any dogs perceived to be pit bulls by the Keota Officials, and the Keota Officials' express threats of enforcement, Droll fears that the Keota Officials will impound and euthanize Gypsy under the guise of the Pit Bull ban.

33. On March 10, 2020, Plaintiff filed suit against Defendants and moved for a Temporary Restraining Order and Preliminary Injunction.

34. On March 25, 2020, Counsel for Defendants informed the Court the City would not enforce the Ordinance against Plaintiff, thus, her Motion for Preliminary Injunction was moot, and a hearing was canceled by the Court.

35. On March 26, 2020, Defendants conducted a meeting of the Keota City Council. At this meeting, Defendants repealed the Ordinance and adopted the Amended Ordinance in its place.

36. On March 26, 2020, Defendants waived the second and third readings of the Amended Ordinance, and unanimously passed and approved the Amended Ordinance. The Amended Ordinance will be in effect from and after its final passage, approval, and publication as provided by law.

37. The Amended Ordinance continues to prohibit "pit bull" dogs, with only slight variation in its definition, and with the addition of an apparent appeal process that had been previously lacking and pointed out by Plaintiff's suit.

38. The changes to the Ordinance fail to address the legal infirmities of the Ordinance. Defendants have the apparent intention of continuing their enforcement of the Amended Ordinance.

39. If it were not for the Amended Ordinance, Droll would adopt another dog similar to Gypsy. Droll would also be able to live without fear that Gypsy will be taken from her by Keota Officials under the Amended Ordinance.

**UNRELIABILITY OF VISUAL BREED IDENTIFICATION OF MIXED BREED DOGS**

40. Over the past decade, the understanding of the canine genome has increased greatly. Through scientific study, it is now possible to determine breed composition of dogs through DNA analysis.

41. Study of the canine genome has also resulted in the development of gene markers which identify those genes related to physical appearance. There are approximately 20,000 protein coding genes in the canine genome. Of these, fewer than 1% control the external morphological features associated with the physical appearance attributed to specific breeds of dogs (e.g., ear shape and size, length of legs, length of coat, coat color, color pattern, shape of head, body size and type, and length of muzzle).

42. Due to the manner in which genes combine when dogs of different breeds are mated, mixed breed dogs commonly express physical traits and characteristics that are unrelated to their actual primary breed composition as determined by DNA testing.

43. Due to those same genetic combination factors referenced above, mixed-breed dogs often do not express the physical traits and characteristics that are commonly associated with the breeds that do make up their actual primary breed composition as determined by DNA testing.

44. Even purebred dogs bred together can have offspring that look different than its parents, even to the extent of no longer matching the AKC standards for that purebred dog.

45. As a result, scientific studies have determined that even people with training in identifying dog breeds are wrong more often than not in determining the primary breed of a mixed-breed dog based on visual analysis when compared to the animal's actual primary breed composition as determined by DNA testing.

46. According to a manual published by the National Animal Control Association ("NACA"), visual identification of heritage of a mixed-breed dog is nearly impossible.

47. The NACA Manual advises that AKC breed standards only provide "the ideal example" of the breed, and that many dogs which do not pass the ideal standards "are sold as 'pet quality' dogs." The NACA manual also states that "Animal Control Officers don't often come

face-to-face with ideal representatives of the various breeds," and that many dogs bred unconventionally may "bear little more than a faint resemblance to the breed standard."

48. There are more than twenty breeds of dogs commonly misidentified as pit bulls.

**UNRELIABILITY OF BREED AS A PREDICTOR OF DANGEROUSNESS**

49. Although media and news outlets commonly report that certain breeds of dogs are thought to be a greater risk to bite humans than other breeds of dogs, there is no scientific or epidemiological basis for these statements.

50. Supposed scientific conclusions made even as recently as 2005 regarding the efficacy of breed bans are now outdated due to a significant advancement in knowledge regarding dog behavior and genetics.

51. Most non-scientific claims that assert certain breeds pose a greater risk of dangerousness to humans rely on a twenty-year-old study conducted by individual investigators from the Centers for Disease Control and Prevention ("CDC'), the Humane Society of the United States ("HSUS"), and the American Veterinary Medical Association ("AVMA") (*See* Sacks, Jeffrey J., Leslie Sinclair, Julie Gilchrist, Gail C. Golab, and Randall Lockwood. "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998." *Journal of the American Veterinary Medical Association* 217.6 (2000): 836-40) (available at: https://www.avma.org/Advocacy/StateAndLocal/Documents/javma_000915_fatalattacks.pdf) ("AVMA Article").

52. In response to the non-scientific claims that the AVMA Article concluded that certain breeds of dogs were more dangerous than other breeds of dogs, the AVMA issued the following statement:

> In contrast to what has been reported in the news media, the data contained within this report **CANNOT be used to infer any breed-**

> **specific risk** for dog bite fatalities (e.g., neither pit bull-type dogs nor Rottweilers can be said to be more "dangerous" than any other breed based on the contents of this report). To obtain such risk information it would be necessary to know the numbers of each breed currently residing in the United States. Such information is not available.
>
> Data in this report indicate that the number of dogs of a given breed associated with fatal human attacks varies over time, further suggesting that such data should not be used to support the inherent "dangerousness" of any particular breed. More than 25 breeds have been involved in fatal human attacks over the 20-year period summarized in this report.

(emphasis in original)

53. The AVMA further stated, "Statistics on fatalities and injuries caused by dogs cannot be responsibly used to document the 'dangerousness' of a particular breed, relative to other breeds, for several reasons."

54. The CDC responded to the non-scientific use of the AVMA Article by warning that the study "does not identify specific breeds that are most likely to bite or kill, and thus is not appropriate for policy-making decisions related to the topic."

55. HSUS responded to the use of the AVMA Article to support breed-specific bans with a statement that "There is no evidence that breed-specific laws reduce dog bites or attacks on people, and they divert resources from more effective animal control and public safety initiatives. . . . Breed-based policies aren't founded on science or credible data, but on myths and misinformation surrounding different breeds."

56. Scientific studies have demonstrated that there is nothing inherently different about pit bull dogs that set them apart from other dogs in terms of behavior.

57. Pit bulls do not have unusual strength for their size, nor do they have a different jaw size or any jaw "locking" mechanism.

58. The genes influencing behavioral traits such as aggression in mammals are not yet known, despite large scale studies seeking them in human research.

59. Today, behavioral traits are believed to be highly polygenic, meaning they are influenced by many, many genes, each with very small effect size.

60. These genes are also believed to be epistatic, meaning that they interact with each other in highly unpredictable ways – a particular version of gene A may have one effect when present with a particular version of gene B, but may have the opposite effect when present with a different version of gene B (or a particular version of gene C). Epistasis is one of the reasons why reliably controlling behavioral characteristics by selective breeding is difficult: a version of a gene having one effect in a parent animal may have the opposite effect in offspring, when expressed against a different genetic background.

61. For all of these reasons, genetics are not highly predictive of behavior in dogs. Environmental influences, such as appropriate early socialization and maintenance in the home as a family dog, are more predictive of a dog's behavioral traits than its genetics.

62. Breed bans are not a rational approach to addressing the public health concerns of dog bites.

## OPERATION OF THE AMENDED ORDINANCE

63. For mixed-breed dogs, the Amended Ordinance relies on visual identification to determine whether an animal appears to be an American Pit Bull Terrier, American Staffordshire Terrier, or Staffordshire Bull Terrier, or displays "a majority of the distinguishable physical characteristics as set forth and established as physical characteristics by the American Kennel Club [or] United Kennel Club" for these breeds.

64. Upon information and belief, the Keota Officials, or officers in the field under their direction, make their subjective determinations as to whether a dog is a pit bull or has the predominant characteristics of a pit bull based on their visual inspection of the dog.

65. Due to the Amended Ordinance's reliance on visual breed identification for mixed-breed dogs, more often than not:

    a. Mixed-breed dogs will be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though none of these breeds will, in fact, be the predominant breed of the animal; and

    b. Mixed-breed dogs will not be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though one or more of these breeds will, in fact, be the predominant breed of the animal.

66. Droll knows of two others who have received the same threat of owning a "pit bull." Yet, upon information and belief, these neighbors continue to have their dogs.

67. On information and belief, numerous other similar incidents have occurred wherein the Keota Officials, or officers under their direction, authorized or encouraged by the Pit Bull Ban, made arbitrary and/or discriminatory decisions as to which dogs to confiscate under the Ordinance. On information and belief, similar incidents will continue to occur under the Amended Ordinance.

68. As a result of the vague and ambiguous language of the Amended Ordinance, these arbitrary and/or discriminatory decisions are permitted by law and cannot be practicably challenged.

69. Further, as the Keota Officials may take virtually any dog under guise of the Amended Ordinance, regardless of official documentation or DNA tests showing the dog is not a

pit bull, an ordinary citizen cannot know whether their dog—particularly if it is a mixed-breed dog—is subject to the Amended Ordinance.

70. The Amended Ordinance results in a scenario wherein whether any particular citizen's dog is subject to the Amended Ordinance can often depend on the moment-to-moment judgment of a City officer on their patrol.

71. Approximately one-half of the 80 million dogs in the United States are mixed-breed dogs.

72. Upon information and belief, one-half of the dogs in Keota are mixed-breed dogs.

73. Statistically, for the mixed-breed dog population of Keota, the Amended Ordinance will misclassify more than one-half of all mixed-breed dogs and ban dogs that should not be banned under the Amended Ordinance and fail to ban dogs that the Amended Ordinance requires be banned.

74. Upon information and belief, Keota has no evidence of the effectiveness of the Pit Bull Ban or Amended Ordinance.

### CLAIM FOR RELIEF
### Violation of the United States Constitution
### (42 U.S.C. § 1983)

75. Plaintiff incorporates the allegations contained in Paragraphs 1 through 74 as if realleged in this paragraph.

76. The Amended Ordinance is unconstitutionally vague because it fails to provide fair warning of exactly what actions and what animals are prohibited by the Amended Ordinance:

    a. The Amended Ordinance's identification of the animals subject to the ban are overly vague and lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or to provide persons of ordinary intelligence a reasonable opportunity to know what specific animals are prohibited by the Amended Ordinance;

b. The definitions of the animals banned by the Amended Ordinance allow for arbitrary, inconsistent, and discriminatory enforcement by Defendants.

77. Upon information and belief, Defendants have enforced the Pit Bull Ban in an arbitrary, inconsistent, and discriminatory manner and will enforce the Amended Ordinance in an arbitrary, inconsistent, and discriminatory manner.

78. The Amended Ordinance is overinclusive as a safety regulation because it bans animals that do not pose a risk of harm to others.

79. The Amended Ordinance is underinclusive as a safety regulation because it fails to ban animals that do pose a risk of harm to others.

80. By deeming all predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs as dangerous, the Amended Ordinance bears no rational relationship to any legitimate state interest in health, safety or welfare and violates Plaintiff's substantive due process rights.

81. The Amended Ordinance's disparate classification and treatment of owners of predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs from owners of all other breeds of dogs bears no rational relationship to any legitimate state interest and violates the Equal Protection rights of Plaintiff as guaranteed by the Constitution.

82. Under Iowa law, Plaintiff has a protectable property interest in her dog and in her money.

83. The Amended Ordinance authorizes Defendants to immediately impound or destroy any dog found at large and prohibits the keeping of "pit bull" dogs within the City. *See* KEOTA, IOWA, CODE §§ 4-1-5(1); 4-1-8(3), (5-6).

84. The Amended Ordinance does not provide dog owners a meaningful opportunity to respond to allegations against them.

85. The Amended Ordinance does not specify any burden of proof for the determination that a dog is a prohibited pit bull.

86. The Amended Ordinance deters any challenge to a confiscation by holding a dog owner responsible for all "costs associated with the appeal, which may include service fees, attorney fees, and witness expenses." In this manner, the Amended Ordinance punishes dog owners for exercising their right to challenge the deprivation of their personal property and companions.

87. The Amended Ordinance imposes no time limits on how long the Keota Officials may impound a dog before determining it to be a prohibited pit bull.

88. The Amended Ordinance provides no mechanism for an owner to receive an official breed determination before the dog is seized.

89. The threat of indefinite impoundment and associated fees dissuade affected dog owners from exercising their due process rights.

90. The Amended Ordinance expressly allows for and encourages Defendants not to permit dog owners to challenge a seizure of their dog or utilize the appeal process in the first place. The Amended Ordinance states that a pit bull dog may be destroyed at the discretion of the Mayor or Peace Officer if it "cannot be confined or captured[,]" and that Defendants "shall be under no duty to attempt the confinement or capture of a" pit bull found at large, "nor shall [Defendants] have a duty to notify the owner of such animal prior to its destruction." KEOTA, IOWA, CODE § 4-1-8(5).

91. All of the above actions and omissions are the official policies, practices and customs of the Defendants.

92. The official policies, practices and customs of the Defendants as described above violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter judgment declaring that the Pit Bull Ban, Amended Ordinance and related policies, practices, and customs of the Defendants violates the Fourteenth Amendment to the United States Constitution and may not lawfully be enforced in the future;

2. Issue preliminary and permanent injunctions prohibiting the Defendants, their employees and agents, and all persons acting under their direction from enforcing the above referenced Amended Ordinance, policies, practices, and customs;

3. Grant Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4. Grant all such other and further relief as this Court deems just and proper.

Dated this 2nd day of April, 2020.

                LACI DROLL, Plaintiff

BY: */s/ Gene Summerlin*
Gene Summerlin – NE #19611 (*pro hac vice*)
Kamron Hasan – NE #25494 (*pro hac vice*)
Quinn R. Eaton – # AT0013543
HUSCH BLACKWELL, LLP
13330 California St., Suite 200
(402) 964-5000
(402) 964-5050 (fax)
gene.summerlin@huschblackwell.com
kamron.hasan@huschblackwell.com
quinn.eaton@huschblackwell.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of April 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which served notice on all parties of record.

*/s/ Gene Summerlin*