**Randall Lockwood, Ph.D.**
ASPCA Consultant
Policy, Response and Engagement

2214 Tulip Drive
Falls Church, VA 22046
randy.lockwood@gmail.com
randall.lockwood@aspca.org
tel. 347 668-4302
cell 571 225-3463
fax 208 485-2972

November 9, 2020
To Whom it May Concern,

I have been requested to provide an expert report in Plaintiff's case against the City of Keota, Iowa. I have not received compensation for preparing this report.

**Background**

I have undergraduate degrees in psychology and biology from Wesleyan University in Connecticut and a doctorate in comparative and physiological psychology from Washington University in St. Louis with dissertation work on canid behavior and aggression. I became a Senior Vice President for The American Society for the Prevention of Cruelty to Animals (ASPCA) in August of 2005, after serving for 21 years in various capacities at the Humane Society of the United States, including Vice President for Field Services and Vice President for Research and Educational Outreach. In addition to my position with the ASPCA, I am Affiliate Assistant Professor, Small Animal Clinical Sciences, in the College of Veterinary Medicine at the University of Florida, Gainesville, Florida where I have taught classes within the Masters Program in Veterinary Forensic Sciences, including a class on Forensic Applied Animal Behavior which focuses on the application of current scientific knowledge of animal behavior to the law.

I am a Fellow of the Denver University Center for Human-Animal Interaction and the Oxford (U.K.) Center for Animal Ethics. I am a member of the advisory council of the Association of Prosecuting Attorneys. For nearly forty years I have worked closely with humane societies, animal care and control agencies, dog trainers and law-enforcement, serving as an expert on dog behavior, dog aggression, dog-bite prevention, illegal dogfighting and the interactions between people and animals.

I have been an advisor on animal-related public health problems to many city and state governments, law enforcement agencies, utility companies, the Centers for Disease Control, the National Sheriffs Association, the International Association of Chiefs of Police and the U.S. Postal Service.

I was a member of the American Veterinary Medical Association's Task Force on Human/Canine Interaction, established to review the dog bite problem and appropriate community responses. I have served as an expert witness in many civil and criminal trials dealing with dangerous dogs, including the first trials to result in manslaughter and murder convictions of owners of dogs involved in fatal attacks and the high-profile murder/manslaughter trials in the San Francisco dog-mauling death of Diane Whipple. I have participated in several large scale seizures of dogs involved in dog-fighting operations, including the Michael Vick case and the 2007 seizure of more than 400 dogs

**EXHIBIT O**

from 20 locations in eight states and have assisted in the handling and assessment of several hundred dogs from such law enforcement responses.

Below is a list of the cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition: (1) May 2016 – Toronto, Canada, Crown v. Eric Christopher Flemming; (2) January 2018 – Sioux City, Iowa, Myers v. Sioux City.

I have provided training on dangerous dog issues and bite prevention for hundreds of professionals in animal care and control, law enforcement, emergency services and public health. I have served as a subject matter expert in the development of statewide law enforcement training on officer safety in encounters with dogs for California, Colorado, Ohio, Tennessee and Texas.

I was a contributor to ***The domestic dog: Its evolution, behaviour and interactions with people*** (1995: Cambridge University Press, and 2nd edition 2016), ***The Humane Society of the United States' Complete Guide to Dog Care*** (1998: Little Brown) and ***Animal Law and Dog Behavior*** (1999: Lawyers & Judges Publishing). I co-edited ***Cruelty to Animals and Interpersonal Violence*** (1998: Purdue University Press) and am author of ***Animal Cruelty Prosecution: Opportunities for Early Response to Crime and Interpersonal Violence*** (2006: National District Attorneys Association) and co-author of ***Forensic Investigation of Animal Cruelty: A Guide for Veterinary and Law Enforcement Professionals*** (2006: HSP) and **Investigating & Prosecuting Animal Abuse: A Guidebook on Safer Communities** (2013, National District Attorneys Association). I developed the **Dogfighting Toolkit for Law Enforcement: Addressing Dogfighting in Your Community (2011)** under a grant from Community Oriented Policing Services of the U.S. Department of Justice.

**Report**

In the last 12 years, there have been many developments relevant to the issue of breed specific legislation (BSL) including the following:

1. Major advances in the understanding of canine genetics, including the sequencing of the canine genome, challenging many old assumptions about the connections between appearance of breeds and the underlying genetic variation.

2. Many studies attempting to understand genetic contributions to aggressive behavior in a variety of species and the general failure to find simple connections between particular genetic composition (including "breed") and behavior, as well as a lack of evidence for simple genetic determination of aggressive behavior in dogs. (*e.g.*, Duffy *et al.*, 2008).

3. Much research looking at epigenetic (e.g. environment and experiential) influences on the expression of many genes – documenting that genetic background alone is a poor predictor of many traits, including behavior.

4. Extensive work with hundreds of dogs from recent fighting history showing wide variations in behavior and success in rehabilitating and modifying behaviors of many of these dogs.

5. Extensive work by Voith (2013), Olson (2015) and others on the inaccuracy of visual determination of breed, even by experienced animal care and control professionals, when compared with DNA determination. Also, assessment of breed factors (or lack thereof) in fatal dog attacks when results are limited to verified breed determination.

6. Epidemiological assessment of theoretical and actual impact of BSL on reducing injury in areas that have conducted appropriate comparisons, as well as economic analyses of the true costs of implementing BSL (*e.g.*, Cunningham, 2005; Collier, 2006; Patronek *et al.*, 2010; Williams, 2013).

7. Assessment of human factors that provide the strongest predictors of serious and fatal attack (*e.g.*, Patronek *et al.*, 2013).

Focusing on a single breed as the "source" of the dog bite problem reflects a $19_{th}$ century epidemiological mindset that attempts to identify the vector of a public health problem and eliminate that vector. This is the mindset originally applied to animal control due to its early function as a way of controlling a disease – namely rabies. The dog bite problem is **not** a disease problem with a single vector, it is a complex societal issue that must address a wide range of human behaviors in ways that deal with irresponsible behavior that puts people and animals at risk, while minimizing the burdens placed on responsible pet owners. This has long been my stated personal opinion, as well as that of the organizations with which I have worked on these issues, including the HSUS, the ASPCA, the CDC and the AVMA (Lockwood, 1986, 1987, 1988, 1992).

Breed identification of dogs of unknown origin by visual inspection has repeatedly been shown not to correspond with breed identification by DNA analysis. A recent study at the Western University of Health Sciences asked >900 persons engaged in animal related occupations to name the breed or breeds in mixed breed dogs, based on a visual inspection. Their responses did not correlate with the breeds identified through DNA analysis. Further, these respondents frequently disagreed with each other regarding the breed or breeds of the same dog (Voith *et al.*, 2013). Researches from the University of Florida who conducted a similar survey have reported inconsistent identification of pit bull-type dogs. The respondents to the UF survey included veterinarians, animal control officers, kennel staff, veterinary assistants/technicians, and shelter customer service staff. Their responses did not correlate with DNA analysis; and they frequently disagreed with each other as to whether or not a dog was a pit bull (Olson *et al.*, 2015). Hoffman *et al.* (2014) showed shelter workers in the US and the United Kingdom a photo array of 20 dogs and asked, among other questions, whether or not the dog was a pit bull. The findings indicated a lack of consensus, both between and within the United States and United Kingdom, about what constitutes a pit bull terrier. In a litigation challenging a breed ban in Minneapolis, Minnesota, plaintiff showed a photographic array of 24 dogs to animal control officials. The officials were unable to agree as to which dogs were

banned pursuant to the statute. The court ruled the Minneapolis statute void for vagueness. Subsequently, the State of Minnesota enacted a statute prohibiting communities from regulating dogs on the basis of breed. (Tanick, 2009).

Breed-specific restrictions and regulations have been resoundingly and universally opposed by professionals in veterinary medicine, animal behavior, animal care and control, and animal protection as an approach that is ineffective, costly, epidemiologically unsound, and unfair to responsible owners of affected dogs. Among the US animal-related organizations opposed to breed-specific regulation are the Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, the American Humane Association, the Best Friends Animal Society, the American Veterinary Medical Association, the American Veterinary Society of Animal Behavior, the Centers for Disease Control and Prevention, and the National Animal Control Association (the professional association of animal control officers charged with enforcing community animal regulations).

Breed laws have been a source of continuing controversy largely because of their recognized ineffectiveness in reducing incidence of dog bite-related injury. Two countries (Italy and the Netherlands) have repealed their breed specific laws in recent years. US breed specific laws are similarly selective and outdated. During the period of January 2012 through May 2014, approximately seven times as many communities repealed or rejected breed specific laws as enacted them. Nineteen states currently preempt their towns and counties from regulating dogs on the basis of breed.

First, applying a "numbers needed to treat" analysis to dog bites, it has been shown that removing a group of dogs, however defined, from a community is unlikely to prevent even one dog bite-related hospitalization, and impossibly unlikely to prevent a fatality. (Patronek *et al.*, 2010).

Second, though breed bans have been in place in jurisdictions since the 1980s, no well-designed peer-reviewed study has ever been produced showing that the ban has reduced the number of dog bites, the incidents of dog bite-injury hospitalizations (DBIHs), or the number of DBRFs.

In the UK, the Dangerous Dog Act of 1991 did not seem to reduce the number of dog bites to humans caused by restricted breeds over the following 2 years (Klaasen *et al.*, 1996). Longer-term analysis showed bites to have increased 25% since passage of the act (Collier 2006). Martinez *et al.* (2011) report that breeds classified as dangerous in Spain did not display aggressiveness more often than those not listed. Schalke *et al.* (2008) and Ott *et al.* (2008) looked at the results of temperament tests in Germany of 415 dogs receiving compulsory standardized tests and found no significant differences between Golden Retrievers and restricted breeds, resulting in the withdrawal of breed-specific legislation in Lower Saxony. A survey conducted by the Toronto Humane Society showed no significant drop in dog bite cases following enactment of the ban. (Peat, 2010).

Published studies have not shown that dogs subject to bans and restrictions are more likely to bite or injure a human being than another kind of dog. Martinez *et al.* (2011) report that breeds classified as dangerous in Spain did not display aggressiveness more often than those not listed. Schalke *et al.* (2008) and Ott *et al.* (2008) looked at the results of temperament tests in Germany of 415 dogs receiving compulsory standardized tests and found no significant differences between Golden Retrievers and restricted breeds, resulting in the withdrawal of breed-specific legislation in Lower Saxony. Duffy *et al.* (2008) report aggression-related data based on use of the Canine Behavioral Assessment Research Questionnaire (C-BARQ) with owners of 30 breeds, as well as a sample of breed club members. They emphasize that the high within-breed variation in C-BARQ scores suggests that it is "inappropriate to make predictions about a given dog's propensity for aggressive behavior based solely on its breed." (p. 451). They further note the C-BARQ scores for stranger-directed aggression found among Pit Bull Terriers were about average and were inconsistent with their reputation as a 'dangerous breed.' Their C-BARQ scores for owner-directed aggression were below average.

An AVMA review of the literature of dog bite injuries covering more than 40 years and 12 countries concluded that breed was not a significant predictive factor of aggressiveness in its own right, and that pit bull type dogs are not implicated in controlled studies. (AVMA, 2014).

The basis for the opinions offered in my report is my specialized education, training, knowledge and skill in the area of canine genetics and breed identification. All of the opinions expressed in the report are opinions I hold to a reasonable degree of scientific certainty.

*Randall Lockwood*

Randall Lockwood, Ph.D.